Good morning, your honor. I'm Eric Weaver appearing on behalf of Petitioner Wilson. As I set forth in the briefs, I think this case presents an interesting issue about how far the police can go to devise a strategy to avoid Miranda. How do we know they devised a strategy to avoid Miranda? Well, I think that the facts, especially the videotape, if you watch the videotape. There's no evidentiary basis for your conclusion. You're asking us to infer that by their behavior. Exactly. Anybody who was really interested in this should have had a separate hearing and asked them, was this a strategy to avoid Miranda? But that's nowhere in the record. That's true, your honor. It's also true that the Supreme Court's affirmation of Miranda and condemnation of creating these strategies came long after the case became final, both in the Court of Appeal and in the District Court. We condemned these strategies at least 17 years ago in Cooper v. Dupnick when Officer Barkman testified. We didn't care if he asked for his Mirandas or his mommy. We were going to make him confess. That's true. I think, your honor, the facts of this case, especially watching the videotape, the facts are pretty clear that any reasonable person in that situation would have felt that they were under custody. Where's the videotape? The videotape was in the file that was requested by this Court. If it doesn't have it, I can certainly provide a copy to the Court. What you're saying is, if I understand it, is that the judge was clearly erroneous in making his finding that he was a reasonable person, that he was free to go, or that is it a matter of law that a reasonable person would be free to go? I think that the Court, as I understand the standard after Yarbrough, what this Court has to do is make an evaluation of what a reasonable person would have concluded under the circumstances, and then determine whether the California Court of Appeals evaluation of that question was unreasonable in light of the facts. Why was it in light of Matheson? I think in this particular case, if you look at the totality of the circumstances, he's sitting in a room. I definitely encourage the Court to look at the video. He's sitting in a small room. He's in a corner between a table and the corner. The two officers with their guns on their sides, which Officer Starmer keeps playing with his gun during the whole thing. Just the focus of it is not whether, you know, what we would find straight up, okay? The question is, why is it an unreasonable application of clearly established Supreme Court precedent, as articulated in Matheson, where the conduct in a way was even worse because the law enforcement officers there made a false statement? Well, here they made false statements also. The question I had, too, when you responded how we were testing it.  Judge Rahman. Well, there are several false statements here. One of the false statements is that if he confesses, that that will somehow affect his. Matheson. We know what was the false statement in Matheson, and it wasn't, you know, a promise about leniency or whatever. The Court's also said that's okay. My question is very focused. Why is this an unreasonable application of clearly established law as articulated in Matheson? Because I think that no reasonable person in the situation that Mr. Wilson found himself once he's in the interrogation room would have felt that he was free to go. Why is that conclusion dictated by Matheson? Because in this prison, in Matheson, the defendant was ultimately allowed to leave. Well, yeah. What happened here? When was he arrested? I can't tell that from the record. He was arrested at the conclusion of this interrogation. In the room, they said, stand up, you're under arrest? Yes. You know, I read the brief. It just says he was arrested later. Oh, I'm sorry, Your Honor, if I wasn't clear about that. He was arrested at the end of this and taken into custody. He's been in custody ever since. Is that in the cold record somewhere? Yes. It's in the end of the transcript. It's in the – I'd have to look back and tell you exactly what page it's on. But it's at the end of the – I think it was in the testimony in the hearing that they had on the suppression motion in the district, in the Superior Court, the California Superior Court. And where's that in the record? I would have to – I don't have it off the top of my head, Your Honor. I'd have to give it to you. I don't have it anywhere. I think the transcript pages of that are in the excerpt of record. I'll look and provide that to the court. I think that the – Is that on the tape, his arrest? No, I don't think it's on the tape. It's after the tape is concluded. I think that what's dictated by this is that there are two points in the tape where Mr. Wilson says, it sounds like I'm under arrest. It sure did. Yeah. It did sound like he's under arrest. And I think that he's – that shows his subjective belief. So the question is, would a reasonable person in his situation felt the same thing? Then they yell at him, no, you're not. Right. Well, they also, when he tells him that, you know, they taunt him about, are you afraid, he says at one point, it sounds like I'm under arrest. And a few pages later in the transcript, it's at ER 121, he says it's getting late and that if he's not under arrest, he needs to go to work, go home and rest so he can go to work. Starmer at that point ignores – Detective Starmer ignores that question and asks Detective McGuire, are we getting anywhere? The whole tone of the interview has been that the only way he can get anywhere is to confess. So it seems to me that that clearly communicates to a reasonable person, unless he confesses, he can't leave, in which case he's under – in custody. So I just think that under the facts of this case, that's what the reason – Your two reasons are that he was arrested at the end of it and that he said a couple of times that he was arrested. Right. That he – are you making an arrest or whatever. Right. There's also the fact that he – his freedom was so restricted that when he asked to take a break to smoke a cigarette, they wouldn't let him do that. Well, you overstated something a minute ago. You made it sound like he said I've got to go to work and they said you're not going anywhere. He said it's getting late, I've got to go to work in the morning. Right. No, that's what I meant. He said I need to go home and rest because I have to go to work in the morning. And then Detective Starmer ignores that. Say I need to go home. He said, yeah, it's getting late. I still have to go to work in the morning unless I'm going to jail tonight. Right. And then Detective Starmer says, is he getting anywhere, ignoring that comment altogether. And then Detective McGuire in this conversation back and forth with Detective Starmer says – What are you rating? It's the ER pages 121 to 122. He says, I'm trying, you know, I'm really trying, but you don't care, but I can't. You know you're really tying my hands, you really are. We're trying to help you. So they keep going back to the whole tone of this whole interrogation is that the only way he can help himself and get out of this jam he's in, get out of the custody that he's in, is by confessing. And so it seems to me that a reasonable person would not have felt free to leave under those circumstances, especially in view of the fact that every time he tries to exert some will during the course of the interrogation, they shut him down. You know, you might have a great case if there was some predicate for the proposition that this was a ploy to drain the essence out of Miranda, but that's not there. And Matheson is a real tough cookie for you to take. I'd like to reserve my time. Sure. Mr. Riley. Thank you. May it please the Court. Justin Riley on behalf of the Respondent. The strategy to avoid Miranda in this case was actually the law enforcement officials operating within the law. Matheson doesn't dictate a different result.   if they don't act within the law. But it's an awfully close. It sounds – I'm sorry? It comes awfully close to not being. Not being within the law? Well, sure. I mean, they take these guys, this guy, they put him in a room, keep him there for... Sixty to ninety minutes. ...a long time. And it's a basically continuing harangue with an awful lot of implicit coercion. They tell him the judge is going to clobber you unless you confess. That's the message that keeps coming across. He asks for, you know, a cigarette break, doesn't get it. I mean, it's about as close as you can get. Ultimately, he was in control of taking a cigarette break in the form of leaving. He was told four times, four times that he could leave whenever he wanted to. One of those times was more than halfway through the haranguing. It was after a request for a cigarette break was denied. And they told him – let me get the quote here. No, you're not under arrest, okay? You have to understand, you are not under arrest right now. Boy, that rings so hollow, it's unbelievable. Does it? Yeah, it sure does. I don't know how... He wasn't in law enforcement for 23 years for nothing. I don't know how they would say it any clearer. I mean, the... Well, by letting him take a cigarette break, for starters. The talismanic utterances called for by the appellant in this case are very similar to the talismanic utterances that are Miranda. It's form. It's utterly form over substance. The problem is nobody bothered to sit down and make the police admit they decided that they could arrest people as long as we don't tell them you're under arrest and keep telling them you're not under arrest. Then we can sweat them until we get what we want. I can't speak to the intent of the office. Nobody can. Does nobody bother to lay the foundation? I wasn't even involved in the trial process of this, so I don't know what they were intending to do. I can look at the facts of this case and say, though, that the State court's decision here was not an unreasonable application of Matheson. It just wasn't. Matheson... That's your Maginot line. There's no doubt about it. Let's see. Any other light you can shed on it other than relying on Matheson? No. I would just point out that Matheson expressly declined or rejected a coercive environment standard for custody. Was he arrested at the moment this quote was over? I can't tell you what the moment was because I saw the videotape and I read the transcript and I didn't notice any arrest, but I don't know how soon in time after that he was arrested. I don't think he went home. I don't know what the time was. I haven't been able to find the tape. Do you know where it is? I mean, it doesn't seem to be part of our record. I believe it was presented to the district court. The district court reviewed it in reaching its decision. Yes. Well, that may be, but the question is where is it? Didn't we try to find it and couldn't? Uh-huh. Yeah, no. We've been told we can't find it. You have no idea where it is, either one of you? I have a copy which I can provide. If you could possibly contact counsel if you could provide a copy, that would be helpful to the court. Okay. That would be great. All right. Anything else? No. There are two more issues unless you have any questions on those or anything else. Thanks. Thank you. Thank you, counsel. The matter just argued will be submitted. Do you want to say something else? I have two points. I will work with counsel to get you the tape. I think that that's the key to deciding this case. Counsel just referred to in the end when Detective McGuire says, no, in the middle of his rank, says, no, you've got to understand you're not under arrest. That is a key point in terms of showing, as Justice Trott said, how hollow it is. He's leaning forward into him in a very threatening way. The whole time he's been pointing his finger at him. And so it's clearly a ritualistic assurance that has no meaning at all. And no reasonable person would have thought that that he was free to go in that situation. With that, since it's obvious that the tape is the key, we'll figure out how to provide that with the Court. And thank you for your time. Thank you, counsel. The matter just argued will be submitted.
judges: Wallace, Trott, Rymer